UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

|  |  |  |
|---|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : : | Civil Action No. 15-cv-8766<br><br>CLASS ACTION<br>DEMAND FOR JURY TRIAL |
| Plaintiff, | : : | **COMPLAINT FOR VIOLATIONS OF** |
| vs. | : : : | **THE FEDERAL ANTITRUST LAWS AND COMMODITY EXCHANGE ACT** |
| BANK OF NOVA SCOTIA, NEW YORK AGENCY; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; BARCLAYS CAPITAL INC.; CANTOR FITZGERALD & CO.; CIBC WORLD MARKETS CORP.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; COUNTRYWIDE SECURITIES CORPORATION; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC and UBS SECURITIES LLC, | : : : : : : : : : : : : : : : : : : : : : : : : : : : | |
| Defendants. | | |

_____X

## TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................................ 1

JURISDICTION AND VENUE ....................................................................................... 10

PARTIES ........................................................................................................................ 11

FACTUAL ALLEGATIONS ........................................................................................... 18

   I.   TREASURY MARKET BACKGROUND ............................................................ 18

      A.  Types of Treasury Securities ......................................................... 20

      B.  Primary Dealers ............................................................................. 21

      C.  Treasury Auctions .......................................................................... 23

      D.  Secondary Market and Derivatives ............................................... 28

   II.  ECONOMIC ANALYSIS CONFIRMS COLLUSION TO INCREASE SPREAD ........ 31

      A.  Magnitude of Spread Favoring Defendants: Before and During Class Period ........... 33

      B.  Frequency of Spread Favoring Defendants: Before and During Class Period ........... 39

      C.  Related Empirical Analyses Confirm Conspiracy ....................................... 45

   III. DIRECT EVIDENCE CONFIRMS DEFENDANTS' COLLUSION ............................ 47

      A.  Defendants Improperly Shared Price Information to Aid Their Collusion ............... 47

      B.  Defendants Had the Motive and Opportunity to Collude ........................................... 50

         1.   Defendants' Motive to Collude ..................................................... 50

         2.   The Treasury Market Provided "Fertile" Ground for Collusion ....................... 50

      C.  Direct Evidence of Treasury Manipulation ................................................. 52

      D.  Violations of Primary Dealer Best Practices and Antitrust Guidelines .................... 54

   IV. RELATED GOVERNMENT INVESTIGATIONS SUPPORT CONSPIRACY ........ 55

      A.  LIBOR Scandal .............................................................................. 57

      B.  Foreign Exchange Scandal ........................................................... 59

      C.  ISDAFix Scandal ........................................................................... 61

   V.  EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT ......................... 62

   VI. RESTRAINT OF TRADE AND ANTITRUST INJURY ......................................... 63

   VII.    CLASS ACTION ALLEGATIONS ................................................................... 64

COUNT I ....................................................................................................................... 67

COUNT II ...................................................................................................................... 69

COUNT III .................................................................................................................... 70

COUNT IV ................................................................................................................... 70

COUNT V ..................................................................................................................... 71

COUNT VI .................................................................................................................... 72

COUNT VII ................................................................................................................... 73

PRAYER FOR RELIEF ............................................................................................... 74

JURY DEMAND ........................................................................................................... 75

The Mayor and City Council of Baltimore, on behalf of itself and all others similarly situated, brings this class action for violations of the Sherman Act and the Commodity Exchange Act, and other causes of action, and alleges as follows:

## NATURE OF THE ACTION

1.      The Defendants – who comprise the 22 designated "primary dealers" of treasury auctions – regularly rigged auctions for treasury securities and colluded to increase the spread between auction and secondary-market prices for Treasury securities between January 2007 and June 2015 (the "Class Period").  Treasury securities are sold at supposedly competitive auctions. Defendants, as the designated primary dealers, collectively dominate those auctions by acquiring on average 70-80 percent of all auctioned securities.  Because Defendants acquire the vast majority of treasury securities, they also dominate, and can control the price of, the initial sale of these treasuries to participants in the secondary market (either prior to the auction in the "when-issued" market or immediately after the auctions).  Their collusion consisted in rigging the auctions to depress the prices at which they bought the securities and colluding to sell those same securities at higher prices in the secondary market at or around the same time.  This collusion is evidenced by direct evidence of treasury market manipulation, evidence of collusive and improper exchanges of confidential client pricing information leading up to treasury auctions, and empirical evidence demonstrating that the spread between auction prices and secondary market prices reached anomalous highs during the class period. For example, during the Class Period, the yields that Defendants received for 2-year Treasuries were on average 5 percent higher than the yields that Defendants sold these same Treasuries for in the secondary market on the same days.  This is a much higher spread than historical averages and much higher than a competitive market would consistently bear over such a long period.  Absent collusion, this large variance in prices that favors Defendants should not occur because the auctions and secondary

markets are pricing the same products on the same days, and both markets are highly liquid and efficient (absent collusion). Not only does the empirical evidence confirm that Defendants colluded to depress auction prices, but it also demonstrates that Defendants colluded to resell those securities in the secondary market at higher prices: if the collusion consisted only in increasing auction yields, and Defendants competed vigorously to resell those securities in the secondary market, there would not be such high and anomalous *spreads* between auction yields and secondary market yields, as are observed during the Class Period.

2.     The Mayor and City Council of Baltimore ("Baltimore" or "Plaintiff") transacted in treasury securities directly with the Defendants, including by buying treasury securities directly from Defendants on or between the days when the security was auctioned and first issued a few days later.  By paying inflated and supracompetitive prices for the treasury securities that it bought directly from Defendants, Baltimore was harmed.  Baltimore bought hundreds of millions of dollars of treasury securities during the Class Period between auction and issue days, and was harmed by paying supra-competitive prices.

3.     The U.S. Treasury Department regularly borrows to finance the Federal Government's debt by issuing treasury securities. The public debt of the United States doubled from $8.68 trillion in 2006 to $17.35 trillion in 2013.  Approximately two-thirds of that debt is held in Treasury bills, notes, bonds, Treasury Inflation-Protected Securities and floating rate notes, and these are bought and sold in primary auctions and in secondary markets including the when-issued market (collectively, "Treasury Securities").  Because these debt obligations are backed by the "full faith and credit" of the government, and thus by its ability to raise tax revenues and print currency, U.S. Treasury securities are generally considered among the safest of all investments.  Futures and options on Treasury Securities are also traded on the Chicago

Mercantile Exchange ("CME") (collectively, "Treasury Derivatives" or "Treasury Futures" and with Treasury Securities, "Treasuries" or "Treasury Instruments"). The market for Treasury Securities and Treasury Derivatives (collectively, the "Treasuries Market") is the largest, most liquid and active bond market in the world. A recent Joint Staff Report by the U.S. Department of the Treasury highlighted the importance of these instruments to the economy:

> The U.S. Treasury market is the deepest and most liquid government securities market in the world. It plays a critical and unique role in the global economy, serving as the primary means of financing the U.S. federal government, a significant investment instrument and hedging vehicle for global investors, a risk-free benchmark for other financial instruments, and an important market for the Federal Reserve's implementation of monetary policy.[1]

4.      The Treasury Department sells Treasury Securities at auctions via TAAPS (Treasury Automated Auction Processing System).   The Defendants in this action are the designated "primary dealers" of Treasury auctions. Primary dealers—banks and broker-dealers that trade in U.S. Treasuries with the New York Fed—are the largest group of buyers at auction. While others may participate in auctions, only the designated primary dealers are required to bid a specified amount in every Treasury auction.  Collectively, they have dominant market power in the primary auction market where treasury securities originate, and in the secondary and derivative market where they are resold and traded.

5.      Treasury auctions are designed to minimize the cost of financing the national debt.  To that end, they rely on supposedly vigorous competition among bidders, especially primary dealers.  Prior to the closing of the auctions, bidders are supposed to keep their bids confidential in order to preserve the competitive nature of the bidding process.  And yet, as the empirical and other evidence demonstrates, the primary dealers regularly rigged these auctions between 2007 and June 2015.  In particular, Defendants conspired to drive up the yield of the

---

[1] http://www.treasury.gov/press-center/press-releases/Documents/Joint_Staff_Report_Treasury_10-15-2015.pdf

treasuries[2] (and correspondingly to drive down the prices of those Treasuries); Defendants then sold the Treasuries at higher prices (and correspondingly lower yields) in the secondary market, reaping substantial profits.   Defendants also dominated the when-issued market, in which Treasuries are traded in advance of the auctions, and manipulated and conspired to manipulate when-issued Treasuries by selling when-issued Treasuries at higher prices without revealing to their counterparties that they intended to, and did, rig the auction prices to their advantage and the detriment of their counterparties.

6.      According to a Bloomberg article published on June 24, 2015, the U.S. Department of Justice has commenced an investigation into Defendants' misconduct:

> The U.S. federal probe that ended last month with guilty pleas and $6 billion in fines from global banks began with an open secret—that currency traders there could talk to each other to coordinate trades.
>
> Now, the Justice Department unit behind those prosecutions is turning its sights on the $12.7 trillion U.S. Treasury market, a world with some of its own open secrets.
>
> Dozens of times a year before the Treasury holds an auction, salespeople at 22 primary dealers field billions of dollars in bids for government debt. Traders working at some of those financial institutions have the opportunity to learn specifics of those bids hours ahead of the auctions, according to several people familiar with these operations.
>
> Traders at some of these dealers also have talked with counterparts at other banks via online chatrooms, according people familiar with the operations, with one of them adding that the traders swapped gossip about clients' Treasury orders as recently as last year.
>
> Such conversations, both inside banks and among them, could give traders information useful for making bets on one of the most powerful drivers of global markets, the U.S. debt sales that often sway the prices of trillions of dollars worth of bonds.[3]

---

[2] Treasury yield, commonly expressed as a percentage, refers to the return on investment on Treasury Securities. Looked at another way, the Treasury yield is the interest rate the U.S. government pays to borrow money for different lengths of time on Treasury Securities.
[3] http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries.

7.     That investigation has now broadened to other regulators.  In August 2015, the New York Department of Financial Services sent letters to several defendant primary dealers seeking information on potential manipulation of U.S. Treasury auctions, according to a Bloomberg article that cites a person familiar with the matter.[4] These include Defendants Barclays Plc, Deutsche Bank AG, Goldman Sachs Group Inc, Societe Generale, and Credit Suisse Group AG.  While those letters were reportedly not sent to every primary dealer, the New York Department of Financial Services was reportedly not focused on any one bank to the exclusion of others.   According to a November 3, 2015 press report, citing people familiar with the matter, the New York regulator asked banks to respond with troves of information about their orders, trading and pricing in Treasury sales, said the person. The agency also asked for details of any communications between traders at different banks related to the Treasury auctions.  On November 3, 2015, citing two sources, the New York Post also reported that the New York Department of Financial Services is in the process of combing through years of chats and emails related to Treasury auctions.  The New York Post also reported that the federal investigation led by the Justice Department is using the same blueprint that led to settlements, billions of dollars in fines and, in some cases, jail time for traders accused of rigging the foreign currency markets and a benchmark interest rate known as Libor.

8.     On November 3, 2015, Defendant Goldman Sachs acknowledged in a regulatory filing that it is under investigation for possible manipulation of the $13 trillion US Treasuries market.  Goldman noted that regulators were scrutinizing activities related to the offering and auction of various securities, as well as "when-issued trading," and press reports have tied these

---

[4] http://www.reuters.com/article/2015/09/09/globalbanks-probe-idUSL4N11F48M20150909

references to the regulatory investigations into Treasury securities.

9.      On November 3, 2015, the Wall Street Journal reported that the Banks are in the process of providing details to prosecutors at the Fraud Section at the Justice Department, as well as investigators at the Commodity Futures Trading Commission, according to people familiar with the matter.   According to the Wall Street Journal, the involvement of the CFTC suggests that investigators are examining futures trading that occurs ahead of and around Treasury auctions.

10.     Treasury Securities also trade in a secondary market.  One of Defendants' primary purposes in buying Treasury Securities at auction is to sell them for profit on the secondary market, to entities like Baltimore (which transacted directly with several Defendants). Defendants thus have a financial incentive to collude to increase the spread between (low) auction prices for Treasury Securities and (higher) prices on the secondary market.  This is what they did.  The victims of this scheme include those who transacted in Treasury Securities on the secondary market who lost money as a result of the conspiracy; those who transacted in artificially manipulated Treasury Securities with Defendants rather than the competitively priced instruments they were promised; and those who purchased futures or other derivatives tied to the value of the Treasuries where the value was depressed by the collusion.

11.     While the Federal and State investigations are continuing, Plaintiff's counsel has hired experts to conduct an empirical investigation into the alleged collusion.  The results of that investigation, set forth below, confirm that Defendants have been consistently conspiring to rig Treasury auctions to their benefit and the detriment of plaintiff between 2007 and June 2015. That conclusion is reinforced by press reports that Defendants were conspiring to exchange their respective private client order information in advance of auctions and secondary market trades,

in violation of industry antitrust guidelines.  It is also reinforced by the structure of the industry, which experts commonly agree is ripe for collusion.

12.     To take one of the many examples set forth below, in many instances the exact same types of Treasury Securities were traded on the secondary market at the same time that they were available at auction.  Because the secondary market for Treasuries securities is enormous, liquid and efficient, the prices at auction and in the secondary market for the same securities should have been roughly the same.  But the data shows that between 2007 and June 2015 (and unlike in periods before and after that) Defendants consistently obtained much higher yields for Treasury securities in the auctions than the same securities were trading for in the secondary market (for instance, a 5 percent spread in 2-year notes, as compared to a 1 percent spread prior to the Class Period).  This should not have happened absent collusion. Since risks of default are very low in the Treasury market, distribution of Treasury securities is easy, and relationships between buyers and sellers of Treasury securities are presumably arms-length, there is no explanation (absent collusion) for the much cheaper prices that Defendants received at auction. When the auction results were announced, the secondary market prices converged to the cheaper auction prices, hurting all those that held Treasury securities at the time. Following the announcement of the DOJ's Treasuries investigation, signs of artificiality dissipated, which is a strong indicator that the banks were misbehaving and stopped doing so when the DOJ started inquiring.

13.     Two features of the Treasury Securities market, and the primary dealers, made this conspiracy more feasible, and more plausible.

14.     ***First***, the Treasury market, as it is currently structured, is a fertile area for collusive behavior among primary dealers.  To begin, there is infamously very little oversight

over the Treasury Securities market.  Unlike other markets, there is no central authority charged with policing the market to prevent illegal trading.  As one White House spokesman remarked, "[n]o one is" a regulator of Treasury Securities.[5]  This lack of policing is particularly concerning given the significant changes in the Treasury Securities market structure over the years.  A University of Houston finance professor recently commented that "[i]t is rather remarkable that the Fed and Treasury have taken little interest in the dramatic change in market microstructure and trading technology [of Treasuries]."[6]  One such change is the significant decrease in the number of primary dealers authorized to trade in Treasury Securities with the New York Fed.  In 1988, there were 46 primary dealers.  Today there are only 22, including each of the Defendants. Not surprisingly, these dealers have been characterized as an oligopoly and "cartel of bond-market dealers [that] … have a privileged position in the market to purchase U.S.-government debt securities."[7]  This, in turn, "reduces competition in bond auctions," but gives the dealers "a bite of profit from buying and reselling Treasury issues."[8]  "In the Treasury market, where you have a small number of participants and the sales volume is very high, it is a fertile area for harmful collusive behavior," said James Cox, a professor at Duke University School of Law who focuses on financial markets."[9]

15.   **_Second_**, Bloomberg has reported – based on confidential sources familiar with Defendants' operations – that traders from several Defendants used chat rooms to exchange confidential client information that could help them coordinate to rig auctions and profit at the

---

[5] Matthew Leising, *Why the Treasury Market Needs a Lifeguard,* Bloomberg, Dec. 11, 2014, http://www. bloomberg.com/bw/articles/20  14-12-11/why-the-treasury-market -needs-a-lifeguard.

[6] *Id.* at 2.

[7] Thomas G. Donlan, *The Capo of Cartels,* Barron's, May 18, 2009, http://online.barrons.com/articles/SB 124242706194525305 ?tesla=y.

[8] *Id.*

[9] Alexandra Scaggs, Daniel Kruger & Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Isa Good Place to Start,* Bloomberg, June 23, 2015, http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes- treasuries.

expense of secondary market participants.  According to Bloomberg:

> Dozens of times a year before the Treasury holds an auction, salespeople at 22 primary dealers field billions of dollars in bids for government debt. Traders working at some of these financial institutions have the opportunity to learn specifics of those bids hours ahead of the auctions, according to several people familiar with these operations.
>
> Traders at some of these dealers also have talked with counterparts at other banks via online chatrooms, according to people familiar with the operations, with one of them adding that the traders swapped gossip about clients' Treasury orders as recently as last year.
>
> Such conversations, both inside banks and among them, could give traders information useful for making bets on one of the most powerful drivers of global markets, the U.S. debt sales that often sway the prices of trillions of dollars' worth of bonds.[10]

Making matters worse, Bloomberg reports that it is an "open secret" that treasury securities traders employed by Defendants "can see orders flowing in" from customers.  This violates Antitrust Guidelines from The Treasury Market Practices Group, a New York Fed-backed committee of industry executives, which recommends that market participants have "information barriers" in place to separate, for example, customer orders and trading functions.

16.     Knowing customer demand – and the improper exchange among defendant dealers of their collective confidential knowledge about customer demand – gives Defendants a unique informational advantage. As one academic paper concluded, "the price of any given [Treasury] issue can be strongly affected by demand, and information about demand may be privately held by auction participants."[11]  Bloomberg quoted one industry insider as saying that "Primary dealers are an insiders club where they're supposed to have more information."

17.     Defendants colluded to exchange this confidential customer information in order

---

[10] http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries

[11] Pegaret Pichler & Alex Stomper, Primary Market Design in the Presence of When-Issued Markets 5-6 (Jan. 2, 2011), http://papers.ssrn.com/S013/papers.cfm?abstract-id=1734020.

to help them optimize their auction bids and to front-run their trading ahead of other investors in the when-issued and other secondary markets, in order to maximize their profits at the expense of other market participants.  As a result of Defendants' conduct, plaintiff and members of the Class paid more for Treasury Securities and Treasury Instruments than they would have absent Defendants' collusive and manipulative scheme.

18.     Although in its early stages, the DOJ's investigation of the Treasury market reportedly grew out of its investigations into anticompetitive conduct in various financial markets and benchmarks, including LIBOR, ISDAFix and the foreign exchange market, where regulators have uncovered extensive evidence of information-sharing through electronic chat rooms and other means.  Several Defendants, their parents, or affiliates have paid fines or pleaded guilty to criminal charges in these investigations, including Barclays, Citigroup, Deutsche Bank, HSBC, JPMorgan, RBS, and UBS (as defined below).

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1337(a), and pursuant to §§4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26), §22 of the Commodity Exchange Act (7 U.S.C. §25).

20.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22 and 28 U.S.C. §1391(b), (c) and (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

21.     Each defendant is subject to personal jurisdiction because each transacted business throughout the United States, including in this District, including by transacting in Treasury Securities and/or Treasury Instruments with Class members throughout the United

States and in this District; and/or committed overt acts in furtherance of their illegal conspiracy in the United States.  Additionally, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and plaintiff's claims arise out of Defendants' conduct.

22.     Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and did, in fact, have a substantial effect on the foreign and interstate commerce of the United States.  During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal conspiracy.

## PARTIES

**Plaintiff**

23.     Plaintiff Mayor and City Council of Baltimore is located in Baltimore, Maryland. Baltimore directly transacted in Treasury Securities and/or Treasury Instruments with one or more of the Defendants during the Class Period, and transacted in Treasury Securities on auction days at manipulated and anticompetitive prices that resulted from Defendants' illegal conduct. As a direct and proximate result of Defendants' collusive and manipulative activities, Baltimore was injured in its business or property.

**Defendants**

24.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is a New York-based branch of a Canadian financial services and banking company with its principal place of business at 250 Vesey Street, New York, New York 10080.  During the Class Period, BNS served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

25.     Defendant BMO Capital Markets Corp. ("BMO") is a New York-based financial services and banking company with its principal place of business at 3 Times Square, 28th Floor,

11

New York, New York 10036.  BMO operates as a subsidiary of BMO Financial Corp.  During the Class Period, BMO served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

26.     Defendant BNP Paribas Securities Corp. ("BNP Paribas") is a New York-based financial services company with its principal place of business at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas operates as a subsidiary of BNP Paribas North America Inc.  During the Class Period, BNP Paribas served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

27.     Defendant Barclays Capital Inc. ("Barclays") is a New York-based financial services company with its principal place of business at 745 Seventh Avenue, New York, New York 10019.  Barclays operates as a subsidiary of Barclays Group US, Inc.  During the Class Period, Barclays served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

28.     Defendant Cantor Fitzgerald & Co. ("Cantor Fitzgerald") is a New York-based financial services company with its principal place of business at 499 Park Avenue, New York, New York 10022.  Cantor Fitzgerald operates as a subsidiary of Cantor Fitzgerald LP.  During the Class Period, Cantor Fitzgerald served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

29.     Defendant CIBC World Markets Corp. ("CIBC") is a Delaware corporation with its principal place of business at 425 Lexington Ave, New York, New York 10017. During the Class Period, CIBC was a primary dealer of Treasury Securities.

30.  Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York-based financial services company with its principal place of business at 390-388 Greenwich Street, New York, New York 10013. Citigroup operates as a subsidiary of Citigroup Financial Products Inc. During the Class Period, Citigroup served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

31.  Defendant Commerz Markets LLC ("Commerz"), formerly known as Dresdner Kleinwort Securities LLC, is a financial services company incorporated in Delaware with its principal place of business in New York, New York. Commerz, under its former name, was a registered primary dealer for Treasury Securities with the New York Fed during the Class Period.

32.  Defendant Countrywide Securities Corporation ("Countrywide") is a financial services company with its principal place of business at 4500 Park Granada, Calabasas, California 91302. Countrywide operates as a subsidiary of Countrywide Capital Markets, LLC, which in turn operates as a subsidiary of Bank of America Corporation. During the Class Period, Countrywide served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

33.  Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a New York-based financial services company with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010. Credit Suisse operates as a subsidiary of Credit Suisse (USA), Inc. During the Class Period, Credit Suisse served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

34.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York-based financial services company with its principal place of business at Financial Square, 32 Old Slip, New York, New York 10005.   Daiwa operates as a subsidiary of Daiwa Capital Markets America Holdings Inc.  During the Class Period, Daiwa, formerly known as Daiwa Securities America Inc., served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

35.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a New York-based investment bank with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005.  Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation.  During the Class Period, Deutsche Bank served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

36.     Defendant Goldman, Sachs & Co. ("Goldman") is a New York-based financial services company with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282.  Goldman operates as a subsidiary of The Goldman Sachs Group, Inc.  During the Class Period, Goldman served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

37.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a New York-based investment banking firm with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018.  HSBC operates as a subsidiary of HSBC Investments (North America) Inc.  During the Class Period, HSBC served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

14

38.     Defendant Jefferies LLC ("Jefferies") is a New York-based financial services company with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022.  Jefferies operates as a subsidiary of Jefferies Group LLC.  During the Class Period, Jefferies, including its predecessor in interest Jefferies & Company, Inc., served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

39.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a New York-based financial services company with its principal place of business at 277 Park Avenue, New York, New York 10172.  JPMorgan operates as a subsidiary of JPMorgan Chase & Co.  During the Class Period, JPMorgan, including its predecessors in interest J.P. Morgan Securities Inc. and Bear, Stearns & Co., served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

40.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a New York-based financial services company with its principal place of business at One Bryant Park, New York, New York 10036.  Merrill Lynch operates as a subsidiary of BAC North America Holding Company.  During the Class Period, Merrill Lynch, including its predecessor in interest Merrill Lynch Government Securities Inc. and Banc of America Securities LLC, served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

41.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a New York-based financial services company with its principal place of business at 320 Park Avenue, 12th Floor, New York, New York 10022.  Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd. During the Class Period, Mizuho served as a primary dealer of Treasury Securities and

transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

42.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a New York-based financial services company with its principal place of business at 1585 Broadway, New York, New York 10036.  Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc.  During the Class Period, Morgan Stanley, including its predecessor in interest Morgan Stanley & Co. Incorporated, served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

43.     Defendant Nomura Securities International, Inc. ("Nomura") is a New York-based financial services company with its principal place of business at 309 West 49th Street, Worldwide Plaza, New York, New York 10019.  Nomura operates as a subsidiary of Nomura Holding America, Inc.  During the Class Period, Nomura served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

44.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian financial services company with its principal place of business at Royal Bank Plaza, 200 Bay Street, Toronto, Ontario, Canada ON M5J 2W7.  RBC also maintains offices at 3 World Financial Center, 200 Vesey Street, 8th Floor, New York, New York 10281 and at One Liberty Plaza, 165 Broadway, New York, New York 10006.  RBC operates as a subsidiary of RBC USA Holdco Corporation. During the Class Period, RBC, including its predecessor in interest RBC Capital Markets Corporation, served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

16

45.     Defendant RBS Securities Inc. ("RBS") is a Connecticut-based financial services company with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901.  RBS operates as a subsidiary of RBS Holdings USA Inc.  During the Class Period, RBS served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

46.     Defendant SO Americas Securities, LLC ("SO") is a New York-based financial services company with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020.  SO operates as a subsidiary of SO Americas Securities Holdings, LLC, which itself is a subsidiary of Societe Generale Group.  During the Class Period, SO served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

47.     Defendant TD Securities (USA) LLC ("TD Securities") is a New York-based financial services company with its principal place of business at 31 West 52nd Street, New York, New York 10019.  TD Securities operates as a subsidiary of TD Holdings II Inc.  During the Class Period, TD Securities served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

48.     Defendant UBS Securities LLC ("UBS") is a Connecticut-based financial services company with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901.  UBS operates as a subsidiary of UBS Americas Inc.  During the Class Period, UBS served as a primary dealer of Treasury Securities and transacted in Treasury Securities and/or Treasury Instruments with plaintiff and/or members of the Class.

49.     Defendants BNS, BMO, BNP Paribas, Barclays, Cantor Fitzgerald, CIBC, Citigroup, Countrywide, Credit Suisse, Daiwa, Deutsche Bank, Goldman, HSBC, Jefferies,

JPMorgan, Merrill Lynch, Mizuho, Morgan Stanley, Nomura, RBC, RBS, SO, TD Securities and UBS are collectively referred to herein as "Defendants."

50.     Various other non-parties unknown to plaintiff at this time also participated as co-conspirators, performed acts and made statements in furtherance of the conspiracy.   Plaintiff reserves the right to identify other co-conspirators and to name subsequently some or all co-conspirators, whether identified here or not, as Defendants.

## FACTUAL ALLEGATIONS

### I.   TREASURY MARKET BACKGROUND

51.     The U.S. Treasury market is used to finance the U.S. federal government and as of September 2015, $12.8 trillion in US Treasury Securities was outstanding.

52.     The amount of outstanding Treasury Securities has been steadily increasing since 2007. The amount of US Treasuries outstanding in 2003 was $2.9 trillion compared to $12.8 trillion today.

**Figure 1: Treasury Securities outstanding**



US treasuries outstanding (2000–Sept. 2015)

Source: SIFMA.

53.     The amount of gross Treasury Security issuance has been increasing and it was $7

trillion in 2014. The amount of gross issuance has almost doubled during the more recent period

2007–2014 to $7.3 trillion annually compared to the 2000–2006 period of $3.8 trillion annually.

19

**Figure 2: Treasury Security issuance by year**



US treasuries gross issuance (2000–Sept. 2015)

Source: SIFMA.

## A.      Types of Treasury Securities

54.      The U.S. Government currently auctions several Treasury securities to finance the public debt including bills, notes, bonds, Treasury Inflation Protected Securities (TIPS), and Floating Rate Notes (FRNs). They are used for investing and hedging purposes and because they are considered to be free of default risk they serve as a benchmark for pricing other types of assets. The Treasury Department auctions securities on a regular and predictable basis. These securities are bought by primary government securities dealers, investment funds, foreign accounts, individual investors, and other investor classifications.

a.      Bills mature in one year or less and are currently offered in 4-, 13-, 26-, and 52-week maturities. Treasury bills (T-bills) do not pay interest prior to maturity and instead are sold at a discount to the par value. For example, if an investor bought a $20,000, 13-week Treasury bill for $19,500 and held it until maturity, the

20

investor would make $500 over 13 weeks.

b.      Cash management bills (CMBs) are occasionally offered in order to meet short-term financial needs. CMB maturities are set on an issue-by-issue basis and typically run from 1-day to approximately 1-year (most are issued with terms of less than three months). CMBs are awarded almost exclusively to primary dealers.

c.      Notes mature in two to ten years and are currently offered in 2-, 3-, 5-, 7-, and 10-year maturities. Treasury notes (T-notes) make a fixed-interest coupon payment every six months and also pay par at maturity.

d.      Bonds have the longest maturity of more than ten years and are currently offered in only a 30-year maturity. Treasury bonds (T-bonds), like notes, make a coupon payment every six months.

e.      Treasury inflation-protected securities (TIPS) were introduced by the U.S. Treasury in 1997 and are currently offered in 5-, 10- and 30-year maturities. The principal amount of a TIPS security is adjusted to the Consumer Price Index (CPI), a commonly used measure for inflation. Therefore, the coupon payments of a TIPS security increases when inflation increases and decreases when inflation decreases.  Treasury TIPS also make a coupon payment every six months.

f.      Floating rate notes (FRNs) were introduced in 2014 and are currently offered in only a 2-year maturity. The FRN pays a quarterly coupon that is indexed to the rate of the most recent 13-week bill offering. Therefore, the coupon payments of a FRN may increase when interest rates increase and decrease when interest rates decrease.

**B.    Primary Dealers**

55.    The Treasuries Market is dominated by primary dealers. The Federal Reserve

Bank of New York ("FRBNY") chooses these dealers based upon their size and their commitment and ability to purchase guaranteed amounts of the Treasury Securities auctioned. Primary dealers are required to adhere to FRBNY guidelines, which are intended to promote the integrity of the auction process

56.     Defendants are the primary dealers.  The Defendant primary dealers—banks and broker-dealers that trade in U.S. Treasuries with the New York Fed—are the largest group of buyers at auction. Primary dealers submit competitive bids and dominate the auction process, purchasing, on average, 70-80% of all Treasury Securities issued.  They are required to bid a minimum specified amount in every Treasury auction.  This amount is determined as the total offering amount divided by the number of primary dealers.[12] The primary dealers buy Treasury bills for their institutional clients and for resale on the secondary market. Although anybody may bid competitively, the competitive bidding is dominated by primary dealers. These financial institutions are also active in buying and selling U.S. government securities in the secondary and derivative portion of the treasury market.

57.     The FRBNY describes the role of primary dealers as including the obligations to: "(i) participate consistently as counterparty to the [FRBNY] in its execution of open market operations to carry out U.S. monetary policy pursuant to the direction of the Federal Open Market Committee (FOMC); . . . (ii) provide the [FRBNY's] trading desk with market information and analysis helpful in the formulation and implementation of monetary policy;" and (iii) "participate in all auctions of U.S. government debt and to make reasonable markets for the [FRBNY] when it transacts on behalf of its foreign official account-holders."  The FRBNY also "expects a primary dealer to maintain a robust compliance program, including procedures to

---

[12] For example, with 22 primary dealers, each dealer would be required to bid approximately $454,545,454 ($10,000,000,000 / 22) on a $10 billion offering

identify and mitigate legal, regulatory, financial, and reputational risks."

58.     Primary dealers have specific roles in auctions, according to the FRBNY, including: "Primary dealers should participate similarly in support of Treasury auctions: the [FRBNY] will expect a primary dealer to bid in every auction, for, at a minimum, an amount of securities representing its pro rata share, based on the number of primary dealers at the time of the auction, of the offered amount. Its bid prices should be reasonable when compared to the range of rates trading in the when-issued market, taking into account market volatility and other risk factors."

59.     The FRBNY also "expects primary dealers to act as responsible counterparties and market participants in their overall conduct," including by "implement[ing] the Treasury Market Best Practices published by the Treasury Market Practices Group (TMPG)."

60.     The primary dealers include broker-dealers and bank-dealers. Both are subject to high minimum net capital requirements.

**C.      Treasury Auctions[13]**

61.     The modern auction process for treasury securities begins with a public announcement by the Treasury. The announcements are generally released several days before an auction. An auction announcement will contain the following information:

- Amount of the security Treasury is selling

- Auction date

- Issue date

- Original issuance date (in the case of a reopening)

- Maturity date

---

[13] *See* Fed. Reserve Bank of N.Y., *Treasury Auctions*, http://www.newyorkfed.org/aboutthefed/fedpoint/fed41.html.

- Terms and conditions of the offering

- Customers eligible to participate

- Noncompetitive and competitive bidding close times

- Additional pertinent information

62.     Once an auction is announced, bids for the security can be submitted through Treasury Direct or through TAAPS. Recent announcements can be found on the TreasuryDirect.gov website.

63.     Bids are accepted immediately after the announcement of a security and are submitted electronically through the Treasury Automated Auction Processing System (TAAPS). All bids are confidential and can be submitted in two types: Non-competitive and competitive. Non-competitive bids are generally submitted by small investors and individuals. All non-competitive bidders are guaranteed to receive securities. The amount of securities that may be sold to a single non-competitive bidder is limited to $5 million per auction. The total amount of non-competitive bids  is small compared to the total offering amount- in 2013, non-competitive awards represented around 2.05%, 0.21%, and 0.29% of the total offering amounts for bills, TIPS, and nominal coupons (notes and bonds), respectively.

64.     Competitive bids are usually submitted by large financial institutions for their own accounts or on behalf of customers. Bids are submitted in terms of a discount rate for bills and a yield for coupon-bearing securities, stated in three decimal places.  In an attempt to ensure competition, bidders are restricted to receiving no more than 35 percent of the total amount of securities available to the public. Many of the securities bought by large dealers are sold and resold on the secondary market to companies, banks, other dealers, and individuals. Primary dealers often submit their competitive bids at the last possible moment, sometimes literally

seconds before the auction closes.  This is because Defendants wait to submit bids until they have gathered information from the when-issued market, in three principal ways.

    a.  First, Defendants are buying and selling both on their own accounts and on the accounts of clients. The information they glean from client orders are used by them to set their strategies in the auction (even though this often violates industry best practice rules). Defendants are typically net-sellers in the when-issued market, and as such, are generally "short" going into the auction; Defendants need to purchase Treasury Securities at auction to fulfill client orders. The more orders Defendants pledge to fulfill at a specified price, the greater the financial risk if the market moves against Defendants at the auction.

    b.  Second, by participating in the when-issued market, Defendants are able to learn what their customers will pay for the yet-to-be-issued Treasury Securities. This information traditionally guides the bids that Defendants put in at the auction.

    c.  Third, as discussed below, Defendants collude with each other to improperly share information with each other about client orders in advance of auctions, which helps optimize their auction strategies.

65.    Competitive bidding typically closes at 11:30am for bills and FRNs and 1:00pm for notes, bonds, and TIPS on the day of the auction (Eastern Time). All submitted bids are consolidated in Treasury Automated Auction Processing System (TAAPS).

66.    Once the auction is completed, TAAPS will process all the bids received and determine the auction's winning price.  It does this first by subtracting the non-competitive bids from the public offering amount to determine the amount of securities available to the competitive bidders. For example, in an $11 billion auction, if $1 billion in non-competitive bids

is received then $10 billion in securities will be awarded to competitive bidders.

| Total Public Offering Amount | $11,000,000,000 |
|---|---|
| Total Noncompetitive Bids | −$1,000,000,000 |
| **COMPETITIVE OFFERING** | **$10,000,000,000** |

67.     In the following example, six separate entities submitted competitive bids into the auction at the rates below.

| NAME | YIELD | AMOUNT |
|---|---|---|
| Bidder 1 | 2.998% | $3.5 billion |
| Bidder 2 | 2.999% | $2.5 billion |
| Bidder 3 | 3.000% | $3.0 billion |
| Bidder 4 | 3.000% | $3.0 billion |
| Bidder 5 | 3.001% | $2.0 billion |
| Bidder 6 | 3.002% | $1.0 billion |

68.     Treasury auctions are designed to minimize the cost of financing the national debt. Therefore, TAAPS works its way down the list of competitive bids and accepts the total amount submitted at the lowest possible bid yields until the full offering amount has been awarded.

| Competitive Offering | $10,000,000,000 |
|---|---|
| Bidder 1 @ 2.998% (*lowest yield*) | − 3,500,000,000 |
| **REMAINING COMPETITIVE OFFERING** | **$6,500,000,000** |
| Bidder 2 @ 2.999% (*next lowest*) | − 2,500,000,000 |
| **REMAINING COMPETITIVE OFFERING** | **$4,000,000,000** |

69.     At this point there is $4 billion remaining for competitive bidding.  However,

there is a total of $6 billion in bids at the next lowest rate (3.000%).  The highest accepted rate (3.000%) is known as the stop-out rate.  When this occurs, each bidder at this rate is awarded a percentage of their total bid amount.  The allocation percentage is calculated by dividing the remaining competitive offering by the total amount bid at the stop-out rate.

$$\frac{\text{Remaining Competitive Offering}}{\text{Total Bids at Stop-Out Rate (3.00\%)}} = \frac{\$4,000,000,000}{\$6,000,000,000} = 66.7\%$$

70.     In the Treasury auction example above, securities would be awarded to the first four bidders only. Bidder 1 and Bidder 2 would each be awarded in full, whereas Bidder 3 and Bidder 4 would each receive a partial allocation of $2 billion (66.67% x $3.0 billion bid).

| NAME | YIELD | AMOUNT BID | AMOUNT AWARDED | ALLOCATION PERCENTAGE | RATE AWARDED |
|---|---|---|---|---|---|
| Bidder 1 | 2.998% | $3.5 billion | $3.5 billion | 100% | 3.00% |
| Bidder 2 | 2.999% | $2.5 billion | $2.5 billion | 100% | 3.00% |
| Bidder 3 | 3.000% | $3.0 billion | $2.0 billion | 66.67% | 3.00% |
| Bidder 4 | 3.000% | $3.0 billion | $2.0 billion | 66.67% | 3.00% |
| Bidder 5 | 3.001% | $2.0 billion | $0 | 0% | N/A |
| Bidder 6 | 3.002% | $1.0 billion | $0 | 0% | N/A |

71.     Treasury sells its securities to the public through single-price auctions, where both successful competitive bidders and noncompetitive bidders buy securities at a price that equals the highest accepted rate (3.000% in the example below) regardless of the rate or yield they submitted. The detailed list of accepted and rejected competitive bids is not released to the public, but the total amount of bids received and total amounts accepted are made available. In

27

addition, the high, low, and median accepted rates as well as other details on the composition of auction bidders are released to the public usually within two minutes of the auction close.  The awarded securities are then issued (at the predetermined date in the future) via the Federal Reserve's Fedwire Securities Service to those successful bidders.

72.     Treasury auctions are held on a regular basis, generally as follows: [14]

| | |
|---|---|
| 4-week bills | Weekly (Tuesdays) |
| 13-week and 26-week bills | Weekly (Mondays) |
| 52-week bills | Every 4 weeks (Tuesdays) |
| 2-year notes | Monthly (End of month) |
| 3-year notes | Monthly (Middle of month) |
| 5-year notes | Monthly (End of month) |
| 7-year notes | Monthly (End of month) |
| 10-year notes | Monthly (Middle of month) |
| 30-year bonds | Monthly (Middle of month) |
| 5-year TIPS | Three times per year (Apr, Aug, Dec) |
| 10-year TIPS | Bimonthly (Jan, Mar, May, Jul, Sep, Nov) |
| 30-year TIPS | Three times per year (Feb, Jun, Oct) |
| 2-year FRN | Monthly (End of month) |

73.     Certain securities (e.g. 10-year note, 30-year bond, TIPS, FRN) have reopenings. In a security reopening, the U.S. Treasury issues additional amounts of a previously issued security. The reissued security has the same maturity date and coupon interest rate as the original security, but with a different issue date.

**D.      Secondary Market and Derivatives**

74.     Upon completion of the auction, the most recently issued bill, note, or bond

---

[14] Fed. Reserve Bank of N.Y., *Treasury Auctions*, http://www.newyorkfed.org/aboutthefed/fedpoint/fed41.html.

becomes "on the-run" and the previous on-the-run issue becomes "off-the-run" upon the issue of the new Treasury Securities.  Both on-the-run and off-the-run trading occurs in the secondary Treasury market.   In general, on-the-run securities tend to be more liquid than off-the-run securities of comparable maturity.

75.     There is also a forward market for Treasury Securities which is tied to Treasury auctions.  Once the auction is announced, the primary dealers begin trading, for themselves and for their institutional clients, forward contracts on the securities to be auctioned.  The maturity date of these contracts is the same day when the newly auctioned Treasury bills are delivered. As the securities are to be delivered "when issued," this forward market is usually referred to as the "when-issued" market, which is also part of the secondary market.  After the auction, trading continues in the when-issued market until the when-issued contracts mature and are delivered, subsequent to which the securities are traded in the secondary market. [15]

76.     The when-issued market serves as a price discovery mechanism that allows participants to gauge the demand for an issue of Treasury Securities, and also provides primary dealers with the opportunity to sell Treasury Securities prior to having to purchase them in the auction.  Prior to the auction, when-issued securities are sometimes viewed as bets on what the ultimate auction price will be.  By reducing uncertainty, when-issued trading allows competitive bidders to bid more confidently and aggressively.  Defendants, as primary dealers, dominate the when-issued market.

77.     Treasury auctions are designed to minimize the cost of financing the national debt through when-issued trading, competitive bidding in auctions and a liquid secondary market.

78.     The trading of already-issued on-the-run and off-the-run Treasury Securities by

---

[15] Securities trade on a "when-issued" basis when they have been announced, but not yet issued.  The transaction is settled only after the security has been issued.

investors and primary market participants takes place in the secondary market.  Primary dealers act as market makers in this secondary market, with standing bid/offer quotes, which functions as an over- the-counter market trading system where parties trade Treasury Securities directly with each other as opposed to on an exchange.  Prices in the secondary market for Treasury Securities are impacted by supply and demand, changes in interest rates, and the prices and yields resulting from auctions of newly issued Treasury Securities.

79.     A dealer in the secondary market for Treasury Securities makes money through the spread- the difference between the bid price (what the dealer is willing to pay for a security) and the ask price (the price at which the dealer is willing to sell the security).

80.     The secondary market for Treasury Securities is highly efficient, with yields and prices quickly reflecting their fundamental values given the available public mix of information.

81.     In addition to trading in the secondary market, Treasury Securities form the basis of several Treasury Instruments, including futures and options that are traded extensively on the Chicago Board of Trade ("CBOT") exchange through CME Group's electronic trading platform, CME Globex.  Treasury futures were originally introduced in 1977 on the CBOT, which merged with the Chicago Mercantile Exchange ("CME") in 2007 and now operates as a unit of CME Group Inc.

82.     In terms of value, trading in Treasury Derivatives on the CME reached roughly $79.6 trillion (notional) in 2013.

83.     While public information is scarce, and Defendants uniquely know the positions they hold, studies have found that primary dealers make significant investments in Treasury Derivatives to hedge the risk associated with acquiring 70-80% of all Treasury Securities auctioned.

84.     Treasury futures and options are available to trade on the CBOT from 5 p.m. to 4 p.m. Central Time the following day, Sunday through Friday, and allow investors to profit from anticipated changes in interest rates and hedge exposure to changes in interest rates.

85.     Market participants can transact in the following Treasury futures available on the CBOT: 2-year and 3-year Treasury Note Futures (representing a contract for delivery of a 2-year or 3-year Treasury Note, respectively, with a face value of $200,000); 5-year and 10-year Treasury Note Futures (representing a contract for delivery of a 5-year or 10-year Treasury Note, respectively, with a face value of $100,000); and Treasury Bond and Ultra Treasury Bond Futures (representing a contract for delivery of a Treasury Bond with a face value of $100,000).

86.     Market participants can transact in the following Treasury options available on the CBOT: 2-year, 5-year and 10-year Treasury Note Options (representing a contract for delivery of a 2-year, 5-year or 10-year Treasury Note Futures contract, respectively); T-Bond Options (representing a contract for delivery of a Treasury Bond Futures contract); and Ultra T-Bond Options (representing a contract for delivery of an Ultra Treasury Bond Futures contract).

87.     According to a New York Fed report, "the U.S. Treasury market comprises the secondary market trading of cash Treasury securities as well as the futures and options on Treasury securities. Prices are tightly linked across these markets."  At settlement of a treasury future, the seller will deliver to the buyer the Treasury Security that is the cheapest for him to deliver (the "cheapest-to-deliver" Treasury Security). The Treasury Derivative price will therefore closely track that price of the corresponding cheapest-to-deliver Treasury Security. As a result, Defendants' collusive manipulation of the yields (and thereby prices) for Treasury Securities directly impacted the prices for Treasury Derivatives.

## II.     ECONOMIC ANALYSIS CONFIRMS COLLUSION TO INCREASE SPREAD

88.     Baltimore purchased Treasury Securities directly from Defendants during the

Class Period.  Baltimore purchased over a hundred million dollars of Treasuries on or between the auction and issue dates of the securities, including directly from Defendants.  The empirical analysis confirms that Baltimore was harmed by paying supra-competitive prices for these Treasuries purchased directly from Defendants.

89.     Plaintiff's expert analyzed historical spreads between auction yields and secondary market yields as a percent of closing yield for the same Treasury Securities on the same days during the Class Period, and in the years before the Class Period.  The data demonstrates a clear pattern: during the Class Period, the yields that Defendants received for 2-year Treasuries at auction were on average 5 percent higher than the yields that Defendants sold these same Treasuries for in the secondary market on the same days. Put in other terms, during the Class Period, Defendants consistently paid lower prices at auction for the same Treasuries on the same days than they sold them for in the secondary market. There is no plausible, non-collusive explanation for this consistently large spread in yields during the Class Period, given that the auction and secondary markets are highly liquid and efficient (absent collusion) and were measuring the yield (and price) of the same products on the same days.

90.     The anomalous and collusive nature of this spread is confirmed by comparing it to the magnitude of the spread in the years preceding the Class Period.  Prior to the Class period, the auction yields and secondary market yields were generally comparable – auction yields for 2-year Treasuries were on average roughly 1 percent higher than secondary-market yields -- as one would expect they would be in a normally functioning market, where both the auction and secondary markets are highly liquid and efficient (absent collusion) and measuring the same thing.

91.     This same analysis also confirms that Defendants were not just colluding to

manipulate the auctions in which they *bought* Treasuries, but also the secondary market in which they *sold* Treasuries on the same days (or shortly thereafter).  That is, if Defendants were only colluding to rig the auction yields at which they bought Treasuries, and they continued to compete vigorously on the yields at which they sold these Treasuries in the secondary market, there would not be a large and anomalous *spread* between auction yields and secondary market yields during the Class Period.  Rather, in that counterfactual scenario, the yield for auctions would be lower than in the but-for-world, but the *spread* between auction and secondary market yields would not be affected.  In other words, the large and anomalous spread itself shows that Defendants (who dominated the market) were also colluding to manipulate the yields at which they sold these securities into the secondary market.

### A.     Magnitude of Spread Favoring Defendants: Before and During Class Period

92.     Plaintiff's expert first compared the spread between auction yield and Bloomberg closing yield measured as a percent of the closing yield.  This analysis measures the premium that Defendants were earning on the spread between buying (at auction) and selling (on secondary market) the same securities on the same days.  The chart below shows that Defendants were earning a 5% spread in yield during the Class Period, which is much higher than a competitive market would consistently bear over such a long period.  Since risks of default are very low in the Treasury market, distribution of Treasury securities is easy, and relationships between buyers and sellers of Treasury securities are presumably arms-length, there is no explanation (absent collusion) for the large yield-premium that Defendants earned for auctions, as compared to secondary market yields, during the Class Period.  The chart below also shows that, for the 2-year note, the percentage spread between the auction yield and the Bloomberg closing yield was much higher post-2007 than pre-2007, as indicated by the taller positive bars in the figure below. Again, this discrepancy cannot be explained absent collusion, given that the

secondary market is highly liquid and efficient (absent collusion).

**Figure 3: 2-Year – Spread between auction yield and Bloomberg closing yield as a percent of closing yield**



93.     While this graph shows some sporadic spikes between 2001 and 2004, the following chart demonstrates that these spikes were sporadic and of much lower magnitude between 2000 and 2006 than they were during the Class Period.  In particular, the average spread during the Class Period was over 5% and the average spread between 2000 and 2006 was roughly 1%.  This difference is highly statistically significant. These discrepancies can only be explained by collusion during the class period.

34

**Figure 4: 2-Year– Pre- and post-2007: Spread between auction yield and Bloomberg closing yield as a percentage of Bloomberg closing yield**



94.     The anomalously high spreads during the Class period are even more aberrant when they are compared to longer historical trends dating back to 1995.  The following chart shows this.

**Figure 5: 2-Year – Spread between auction yield and Bloomberg closing yield as a percent of closing yield**



95.     Plaintiff's experts performed a similar analysis of the spread for 5-year notes, and this analysis shows similar patterns and yields similar conclusions.   Plaintiff's expert's chart below shows that for the 5-year note the percentage spread between the auction and the closing yield was much higher in the Class Period, as indicated by the taller positive bars in the figure below. These discrepancies can only be explained by collusion during the Class Period.

36

Figure 6: 5-Year – Spread between auction yield and Bloomberg closing yield as a percent of closing yield



96.     Once again, an analysis of the average spread before and during the Class Period confirms the anomalously high spreads during the Class Period.  In particular, the average spread during the Class Period was approximately three times higher than between 2000 and 2006. Stated differently, the prices the Defendants paid for the 5-year note were lower in the auction compared to the secondary market during the Class Period, especially as compared to the pre-2007 period. These discrepancies can only be explained by collusion during the class period, given that the secondary market is highly liquid and efficient (absent collusion).

37

**Figure 7: 5-Year– Pre- and post-2007: Spread between auction yield and Bloomberg closing yield as a percentage of Bloomberg closing yield**



**5 Year**
**Pre- and post-2007:  Spread between  auction  yield and Bloomberg closing yield as a percentage  of Bloomberg closing yield**

97.     Once again, the anomalously high spreads for the 5-year notes during the Class period are even more aberrant when they are compared to longer historical trends dating back to 1995. The following chart shows this.

**Figure 8: 5-Year– Pre- and post-2007: Spread between auction yield and Bloomberg closing yield as a percentage of Bloomberg closing yield**



**B.      Frequency of Spread Favoring Defendants: Before and During Class Period**

98.     Another way to analyze whether Defendants' were obtaining anomalously beneficial results during the Class Period is to compare how often auction prices were cheaper than secondary market prices (or auction yields were higher than secondary market yields) for the same securities on the same days before and during the Class Period.  Absent collusion, one would not expect auction prices to be so consistently cheaper than secondary market prices for the same securities on the same days, and one would certainly not expect this ratio to be significantly higher during the Class Period as compared to before the Class Period.  And yet, across all tenors, the data demonstrates that Defendants were consistently getting much cheaper prices at auction than were available in the secondary market (or getting much higher auction

39

yields than secondary market yields), and that their "success" rate increased dramatically during the Class Period as compared to before it.

99.     For example, the chart below shows that during the Class Period, the auction yield for US Treasuries of various tenors exceeded the Bloomberg closing yield <u>for the same securities on the same day</u> more than 70% of the time.[16] The Bloomberg closing yield measures the secondary market closing price on each day for Treasury Securities.  Stated differently, the prices the Defendants paid for the US Treasuries were lower in the auction compared to the secondary market closing price for the same securities more than 70% the time post-2007. In the years between 2000-2006, by contrast, the frequency with which the auction yield exceeded the closing yield was significantly lower across all tenors for which there is data.  Because the secondary market is highly liquid and efficient (absent collusion), this level of consistent discrepancy between auction yield and closing yield – especially when compared to the pre-Class Period -- should not exist for such a long period absent collusion.

---

[16]     The chart below shows the spread between auction yield and Bloomberg closing yield during the 2007 - 2015 time period for most maturities.  The 7-year note was first issued more recently than the others.  The 1-year bill was not issued between April 2001 and May 2008.

**Figure 9: Percent of days auction yield exceeds Bloomberg closing yield**



100.    The following charts detail these patterns for the 2-year and 5-year notes discussed above.  Plaintiff's expert's next chart shows that the auction yield for the 2-year note exceeded the Bloomberg closing yield on the same day more than 90% of the time between 2008 and 2015. This anomalously high discrepancy should not exist for such a long period absent collusion.

**Figure 3: 2-Year– Percent of days auction yield exceeds Bloomberg closing yield**



101.    Plaintiff's expert's next chart shows that the auction yield for the 2-year note exceeded the Bloomberg closing yield on the same day much more frequently in the post-2007 period compared to the pre-2007 period. This difference is highly statistically significant. Stated differently, the prices the Defendants paid for the 2 year note were lower in the auction compared to the secondary market much more often during the post-2007 period compared to the pre-2007 period. This anomalously high discrepancy during the Class Period should not exist for such a long period absent collusion.

**Figure 15: 2-Year – Pre- and post-2007: Percent of days auction yield exceeds Bloomberg closing yield**



102.    Plaintiff's expert's next chart shows that the auction yield for the 5-year note exceeded the Bloomberg closing yield very frequently in the post-2007 period, and 100 % of the time in two years during the Class Period.

**Figure 17: 5-Year– Percent of days auction yield exceeds Bloomberg closing yield**



103.    By contrast, Plaintiff's expert's next chart shows that the auction yield for the 5-year note exceeded the Bloomberg closing yield on the same day much more frequently during the post-2007 period compared to the pre-2007 period. This difference is highly statistically significant. This anomalously high discrepancy during the Class Period should not exist for such a long period absent collusion.

**Figure 4: 5-Year – Pre- and post-2007: Percent of days auction yield exceeds Bloomberg closing yield**



**C.     Related Empirical Analyses Confirm Conspiracy**

104.    Next, an analysis of the difference between when-issued prices and auction prices shows that, during the Class Period, the Defendants were consistently receiving better auction prices than investors expected. That is, auction prices consistently outperformed when-issued prices in a manner that benefited auction participants. This should not have happened absent a conspiracy because the when-issued market is a price-discovery market in which sophisticated investors attempt to predict auction prices. Notably, prior to the Class Period, the discrepancy in prices did not exist, and sharply increased near the beginning of the Class Period.

105.    Next, expert economic analysis of the "auction tail" for T-Notes between 2003 and 2014 supports Plaintiff's allegations of collusion. The stop-out yield is the last price at which

an auction for a particular Treasury Security is awarded – that is, the lowest price in that auction. The median yield of the bids is the midpoint of the accepted bids, but not the average. The auction tail is the difference between the stop-out yield and the median yield of the bids accepted at the auction. The auction yield thus reflects the discount paid to what the bidders were willing to pay.  When auction tail measured as a percentage of the median yield increases, the only plausible explanations are an increase in demand, an increase in volatility or collusion. Near the beginning of the class period, there was a sharp increase in the auction tail as a percentage of median yield. By contrast, this percentage was low in the years preceding the class period.   After examining other measurements of demand and other possible reasons for a decline in demand during this period, and excluding them from mathematical analysis, experts have concluded that these other measurements and factors likely could not have accounted entirely for the sharp increase in the auction tail. That is, mathematical analysis ruled out non-collusive explanations for this increase in the auction tail.

106.    Next, the empirical data shows that Defendants were able to consistently secure for themselves windfall yields/bargain prices in reissue auctions – where the Treasury auctions the exact same securities as are traded on the secondary market – as compared to prices that were being demanded in the secondary market.  During the class period, across all tenors, Defendants got better auction yields for reissued Treasuries than were available contemporaneously on the secondary market 69% of the time), by 0.91 basis points. The chances of that happening absent collusion are virtually nil.

107.    Finally, empirical analysis shows that the spread between auction and secondary market prices consistently increased in Defendants' favor during the Class Period as Defendants won more securities at auction.   In other words, the more that Defendants were involved in

auctions, the more the spread between auction and secondary market prices increased in Defendants' favor. This is true for every maturity of Treasury Securities during the Class Period.

## III.    DIRECT EVIDENCE CONFIRMS DEFENDANTS' COLLUSION

### A.    Defendants Improperly Shared Price Information to Aid Their Collusion

108.    At auction, primary dealers bid both on behalf of themselves and on behalf of clients that place orders in advance of the auctions.  This give dealers a unique ability to see large amounts of order flow and estimate demand for any given issuance at a Treasury Department auction.

109.    Bloomberg has reported – based on confidential sources familiar with Defendants' operations – that traders from several Defendants used chat rooms to exchange confidential client information that could help them coordinate to rig auctions and profit at the expense of secondary market participants.  According to Bloomberg:

> Dozens of times a year before the Treasury holds an auction, salespeople at 22 primary dealers field billions of dollars in bids for government debt. Traders working at some of these financial institutions have the opportunity to learn specifics of those bids hours ahead of the auctions, according to several people familiar with these operations.

> Traders at some of these dealers also have talked with counterparts at other banks via online chatrooms, according to people familiar with the operations, with one of them adding that the traders swapped gossip about clients' Treasury orders as recently as last year.

> Such conversations, both inside banks and among them, could give traders information useful for making bets on one of the most powerful drivers of global markets, the U.S. debt sales that often sway the prices of trillions of dollars worth of bonds.[17]

110.    These conversations – in which dealers exchanged price information about their clients' confidential Treasury orders in advance of auctions – were violations of the TPMG

---

[17] http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries

antitrust guidelines, and only served to coordinate Defendants' bid-rigging and to facilitate their collusion in increasing the spread between auction and secondary market prices for auctions.

111.    Making matters worse, Bloomberg reports that it is an "open secret" that treasury securities traders employed by Defendants "can see orders flowing in" from customers.  This violates Antitrust Guidelines from The Treasury Market Practices Group, a New York Fed-backed committee of industry executives, which recommends that market participants have "information barriers" in place to separate, for example, customer orders and trading functions. Knowing customer demand gives Defendants a unique informational advantage. As one academic paper concluded, "the price of any given [Treasury] issue can be strongly affected by demand, and information about demand may be privately held by auction participants."[18] Bloomberg quoted one industry insider as saying that "Primary dealers are an insiders club where they're supposed to have more information."

112.    Reinforcing this insider's club that is ripe for collusion, many traders employed by Defendants during the Class Period have been accused of wrongdoing and switched job to another Defendant, making the collusion easier because of the close relationships they have developed from past shared employment or otherwise. For example, Glenn Hadden was the head of interest rate trading at Defendant Morgan Stanley between 2011 and 2014. Prior to that, he was a partner at Defendant Goldman Sachs, where he spent 14 years trading U.S. Treasuries. While he was employed at Goldman Sachs in 2008, CME conducted an investigations of alleged manipulation of prices paid for Treasury Derivatives, which resulted in CME imposing a ten-day suspension and an $80,000 fine on Hadden and an $875,000 fine on Goldman Sachs. FRBNY reportedly suspected Hadden of manipulating the prices for Treasury Securities at auction. In

---

[18] Pegaret Pichler & Alex Stomper, Primary Market Design in the Presence of When-Issued Markets 5-6 (Jan. 2, 2011), http://papers.ssrn.com/S013/papers.cfm?abstract-id=1734020.

response to the CME probe, Goldman Sachs placed Hadden on paid leave for roughly one year, and he then left Goldman Sachs and joined Defendant Morgan Stanley as its head of interest rates trading, leading quickly to a significant rise in Morgan Stanley's revenues from interest rate trading.

113.   Bloomberg further reported, citing people familiar with several of the primary dealers, that "[b]ankers have often shared broad guidance, both internally and to clients, on whether demand is slack or strong before auctions."[19]   While many banks have rules prohibiting employees from discussing yields or sizes of client bids before auctions, "[i]n many cases, such guidelines aren't always followed, monitored or enforced."[20]   At Defendants BNP Paribas and Cantor Fitzgerald, for example, there "isn't a consistent understanding among traders and salespeople about whether they can share information about orders before auctions," according to individuals familiar with each of these Defendants.[21]   At Societe Generale, "traders [of Treasury Securities] can get a pre-auction rundown of customers' level of interest."[22]

114.   Bloomberg further reported that in response to these allegations and the DOJ's investigations, certain Defendants made the decision to explicitly prohibit their traders from using electronic multibank chat rooms, including Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman, JPMorgan, Morgan Stanley, RBS and UBS.   Likewise, a spokesman for defendant SO's parent Societe Generale confirms that it now "specifically prohibit[s] the sharing of any information about customer auction orders ahead of Treasury auctions,' and that '[c]ustomer auction orders are not shared outside the desk responsible for the auctions and

---

[19] Scaggs et al., *supra* note 6.
[20] *Id.*
[21] *Id.*
[22] *Id.*

related sales personnel."[23]

115.     Rather than competing in the auctions, Defendants, leading up to the auction, colluded to exchange confidential client auction bidding order flow information – including information regarding client demand for Treasury Securities, sizes of clients' bids, and requested yields and discount rates – executed concerted bidding and/or trading strategies designed to manipulate, and which actually did manipulate, the market for Treasury Securities sold at auction and on the secondary market.

### B.     Defendants Had the Motive and Opportunity to Collude

#### 1.     Defendants' Motive to Collude

116.     The Defendants had a clear motive to collude: profit.  Defendants dominated both the market for purchasing Treasuries at auction and the market for initially selling those Treasuries on the secondary market in the hours and days that followed the auctions.  Defendants all profited by buying Treasuries at cheaper prices at auction and by reselling them at higher prices in the secondary market that followed the auctions.  This is exactly what Defendants did during the Class Period: they colluded to buy Treasuries at lower prices at auction, and colluded to resell them at higher prices in the secondary market, thereby increasing their returns on the spread between auction and secondary market prices.

#### 2.     The Treasury Market Provided "Fertile" Ground for Collusion

117.     There is minimal oversight over the Treasury Securities market and auction process.  Not since the late 1990s have "regulators [taken] a hard look at how Wall Street trades Treasuries."[24]   In fact, "[n]o single regulator in th[e] $12.3 trillion market has the authority or

---

[23] *Id.*
[24] Matthew Leising, *If Treasuries Are Manipulated, Good Luck Finding Any Cops*, Bloomberg, Dec. 8, 2014, http://www.bloomberg.com/news/article2014-12-08/light-speed-treasury-trading-governed-by-rules-dating-to-1998.

expertise to assess evidence of illicit practices."[25]   Indeed, one White House spokesman remarked that "[n]o one is" a regulator of Treasury Securities.[26]   Similarly, a University of Houston finance professor recently commented that "[i]t is rather remarkable that the Fed and Treasury have taken little interest in the dramatic change in market microstructure and trading technology [of Treasuries]."[27]

118.    One such change is the significant decrease in the number of primary dealers authorized to trade in Treasury Securities with the New York Fed.  In 1988, there were 46 primary dealers.  Today there are only 22, including each of the Defendants.  Not surprisingly, these dealers have been characterized as an oligopoly and "cartel of bond-market dealers [that] … have a privileged position in the market to purchase U.S.-government debt securities."[28]  This, in turn, "reduces competition in bond auctions, and raises costs for taxpayers and investors," but gives the dealers "a bite of profit from buying and reselling Treasury issues."[29]

119.    In these circumstances, industry experts have characterized the Treasury market as being a fertile area for collusion. For example, James Cox, a professor at Duke University School of Law who focuses on financial markets, recently stated: "In the Treasury market, where you have a small number of participants and the sales volume is very high, it is a fertile area for harmful collusive behavior," said."[30]  This "fertile area for harmful collusive behavior" provided Defendants a prime opportunity to employ their collusive and manipulative scheme.

120.    The Treasury Market has, in fact, proven itself to be fertile grounds for

---

[25] *Id.*

[26] Matthew Leising, *Why the Treasury Market Needs a Lifeguard*, *supra* note 2.

[27] *Id.* at 2.

[28]  Thomas G. Donlan, *The Capo of Cartels,* Barron's, May 18, 2009, http://online.barrons.com/articles/SB 124242706194525305 ?tesla=y.

[29] *Id.*

[30] Alexandra Scaggs, Daniel Kruger & Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Isa Good Place to Start,* Bloomberg, June 23, 2015, http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes- treasuries.

manipulation and collusion.   In the early 1990s, a joint report issued by the Treasury, the Board of Governors of the Federal Reserve System, and the SEC, found that Salomon Brothers, Inc., had manipulated bids in at least five auctions. In each of those auctions, Salomon Brothers submitted false and/or unauthorized bids. Two of those false bids caused Salomon Brothers to violate the 35% cap on the total amount of Treasury Securities that a primary dealer can obtain at an auction.  Regulators found that improper trading activity was not limited to Salomon Brothers, but rather was systemic. For example, the SEC, Office of the Comptroller of the Currency, and Federal Reserve initiated administrative proceedings against *98* other dealers, brokers, and banks and found that each respondent "engaged in one or more improper practices."   Congress also held hearings into the Treasury auction process as a part of this scandal, in part because it was too easily subject to collusion. Salomon Brothers paid $290 million to settle the charges against it, including a charge of antitrust conspiracy brought by the DOJ.

### C.   Direct Evidence of Treasury Manipulation

121.   Even prior to any discovery or release of information from Government investigations, there is already direct evidence that Defendants in fact engaged in manipulative behavior to steer the Treasury market.

122.   For instance, the Commodity Futures Trading Commission included an example of a trader's attempt to manipulate the U.S. Treasury market in its recent settlement with Defendant Barclays relating to ISDAFix.  According to the CFTC, in the minutes leading up to 11:00 a.m. on a day in 2007, a Barclays options trader emailed traders on Barclays' U.S. Treasuries desk: "I have an exercise at 11am this morning, I will need to sell 635 5s, but I want to push the screens down at 11, as much as . . . you can, so that I can get a better 11 am print." According to the CFTC, this was an attempt to "[p]ush the 5-year U.S. Treasuries price down [which] would increase the yield on those Treasuries and thereby increase the 5-year USD

ISDAFIX."

123.    This attempt to "push the 5-year U.S. Treasuries price down" by a Defendant's trader plausibly implies that traders employed by primary dealers reasonably expected that Defendants were <u>able to</u>, and in fact did, manipulate the secondary market for Treasuries.

124.    Evidence of Defendants' manipulation of the Treasuries Market was also on display during an event on October 15, 2014 that gave rise to a Joint Staff Report by U.S. Department of the Treasury, the Board of Governors of the Federal Reserve System, FRBNY, SEC and CFTC. On October 15, 2014, yields on treasuries "experience[d] an unusually high level of volatility and a very rapid round-trip in prices" for no apparent reason. These rapid shifts were nearly unprecedented in magnitude for a short duration -- between roughly 9:30 and 9:39, the yield on a 10-year T-Note fell from 2.02% to 1.86%, and from roughly 9:39 to 9:45, the yield increased to 1.99%.  This was the first time in history that a shift of this magnitude on this time-scale was not preceded by any financial news that caused the shift.  And yet, even during this highly volatile period in which prices Treasury were moving with no economic basis, the prices for Treasury Securities and Treasury Derivatives remained in sync.

125.    As a Joint Report noted, "[a]nalysis of transaction and order book data during the event window revealed two notable patters in activity," which were "high levels of cancellations and self-trading."  Both are commonly used tools by cartels to manipulate similar markets: submitting fake bids (or fake transactions with co-conspirators) and then cancelling them (called "spoofing") to move the market, or trading with oneself or making offsetting trades with co-conspirators (called "wash trades") to move the market.  As the report noted, this improper activity was not limited to the October 15, 2014 event, but was prevalent on other randomly chosen days during the class period.  The report also noted that "self-trading may reflect

unlawful conduct."

126.    These examples imply that Defendants were able to manipulate Treasuries, frequently used improper devices that are commonly used to collude in the manipulation of Treasuries, and in fact manipulated Treasuries during the class period.

### D.    Violations of Primary Dealer Best Practices and Antitrust Guidelines

127.    In a revised policy addressing the business standards expected of primary dealers, the New York Fed instructed that it expects "primary dealers to act as responsible counterparties and market participants in their overall conduct and support of market efficiency and liquidity.  As an example, the New York Fed expects its counterparties to have implemented the Treasury Market Best Practices published by the Treasury Market Practices Group (TMPG)…."[31]

128.    The TMPG is an industry group sponsored by the New York Fed consisting of various members, including representatives from several primary dealer Defendants, including Barclays, Citigroup, Goldman, JPMorgan, Morgan Stanley, and until recently, HSBC.   The TMP's *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets ("Best Practices")* and *Automated Trading in Treasury Markets* publications purport to "represent[] the views of the private sector members" only.[32]   The TMPG, including the defendant members, updated its *Best Practices* guidelines in June 2015 to "promote the integrity and efficiency" of the Treasury market[33] and Defendants are urged to "not engage in

---

[31] Fed Reserve Bank of N.Y., *Operating Policy:  Administration of Relationships with Primary Dealers* (Jan. 11, 2010), http://www.newyorkfed.org/markets/pridealers_policies.html.
[32] *E.g.*, Treasury Market Practice Group, *Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets* 7 (June 2015) http://www.newyorkfed.org/tmpg/TPMG_June%20215_Best%20Practices.pdf.
[33] Press Release, Treasury Market Practice Group, *TMPG Releases Updated Best Practice Guidance to Address Automated              Trading            (June            10,            2015),* http://www.newyorkfed.org/tmpg/TMPG_June%2010%202015_Press%20release.pdf

illegal activities such as price manipulation."[34]

129.    The Treasury Market Practices Group provides antitrust guidelines for its group members and makes "best practices" recommendations for traders and investors, including that market participants have "information barriers" in place to separate, for example, loan origination and trading functions.[35]   These antitrust guidelines include the following "conduct to avoid":

> **Sharing Price Information.** Members should never share or compare information concerning their firms' prices or fees, or the process of setting prices or fees, including costs that impact pricing or bidding, as this may be seen as an implicit attempt to fix prices, fees, or commissions.[36]

130.    Defendants understood their crucial role in the proper functioning of the Treasury markets, and through the *Best Practices* guidelines Defendants intended to ensure that they operated in accordance with certain principles.

131.    Despite being aware of this role, however, Defendants leveraged their special position as primary dealers and market makers for Treasury Securities and Treasury Instruments to manipulate the Treasury markets to their benefit and to the detriment of others, including plaintiff and Class members.   As discussed above, they shared confidential client price information in violation of these rules, and colluded to manipulate the spread between auction and secondary prices in violation of these rules.

## IV.    RELATED GOVERNMENT INVESTIGATIONS SUPPORT CONSPIRACY

132.    The Bloomberg article revealed that the Treasuries investigation "grew out of cases in which prosecutors established that traders were trying to manipulate interbank interest

---

[34] *Id.*
[35] http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries
[36] http://www.newyorkfed.org/tmpg/antitrust_guidelines.pdf

rates and align foreign-exchange trades, people familiar with the probes have said."[37] Many of the same Defendants here pleaded guilty to rigging various financial instruments involving allegations that "traders engaged in cartel-like behavior by sharing information, such as via chatrooms."[38] Similar to what the DOJ discovered in connection with its criminal investigation into the foreign exchange market, LIBOR, and ISDA-fix, Defendants' employees used electronic chat rooms to share confidential information about client order flow (including information regarding demand and pricing) for Treasury Securities to aid their collusion.  With each passing scandal, it becomes clear that these are not isolated events, but rather Defendants, and other banks, have repeatedly and consistently used every opportunity available to collude to manipulate financial instruments that are at the heart of the economic system, to their profit and the detriment of their counterparts.

133.    There is a striking overlap between the Defendants here and the targets of the various other investigations into collusive manipulation.  The following chart shows targets of various investigations and the bolded entities are Defendants in this case:

---

[37] http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries
[38] *Id.*

| Bank Family | LIBOR | FX | ISDAFIX | TREASURY |
|---|---|---|---|---|
| Bank of America | X | X | X | |
| **Barclays** | X | X | X | X |
| **BNP Paribas** | X | X | X | X |
| **Citi** | X | X | X | X |
| **Credit Suisse** | X | X | X | X |
| **Deutsche Bank** | X | X | X | X |
| **Goldman Sachs** | | X | X | X |
| **HSBC** | X | X | X | X |
| **J.P. Morgan** | X | X | X | X |
| **Morgan Stanley** | | X | X | X |
| **Nomura** | X | X | X | X |
| **Société Générale** | X | X | | X |
| Rabobank | X | X | | |
| **RBC** | X | X | | X |
| **RBS** | X | X | X | X |
| **UBS** | X | X | X | X |

134.    So far, the LIBOR, FX, and ISDAFIX investigations have resulted in worldwide government fines of roughly $19 billion against Defendants or their affiliates, and the investigation into other Defendants or their affiliates in these cases as well as in ISDAFIX is ongoing.

**A.    LIBOR Scandal**

135.    Numerous Defendants pled guilty and/or have settled with government regulators for collusion of LIBOR, the most widely used interest rate benchmark in the world during the period of collusion. The 16 members of the LIBOR panel – which included during the relevant period the 12 Defendants in this case listed in the chart above -- colluded with one another to submit false LIBOR submissions, which caused the published LIBOR to be manipulated to Defendants' advantage.  The DOJ has charged that this conspiracy constituted price fixing in violation of Section 1 of the Sherman Act.

136.    As with treasury auctions, the LIBOR banks accomplished this conspiracy

through electronic and telephonic communications by a tightly-knit group of traders that agreed

on the LIBOR quotes to be submitted on any given day. This was done both in direct bank-to-

bank communication as well as facilitated through brokers.

137.   Some representative fines imposed on Defendants to this action from the LIBOR

scandal are as follows:

a.   In June 2012, defendant Barclays (and its parent companies, Barclays PLC and

Barclays Bank PLC) was fined over $450 million by the CFTC ($200 million),

DOJ ($160 million) and the U.K. Financial Services Authority ("FSA") ($91

million) in connection with its manipulation of LIBOR and Euribor rates.

b.   In December 2012, UBS AG (the parent of defendant UBS) and a Japanese

subsidiary agreed to pay regulators a total of $1.5 billion in fines for LIBOR rate

manipulation.   The fines include a $400 million penalty as part of a non-

prosecution agreement between UBS AG and the DOJ, requiring the company to

continue cooperating with the DOJ in its investigation, and a $700 million penalty

by the CFTC for UBS AG and its subsidiary's role in manipulating LIBOR.[39]

c.   In February 2013, RBS and its wholly-owned subsidiary RBS Securities Japan

Ltd. agreed to pay $150 million in criminal fines to the DOJ for its role in

manipulating LIBOR.  This was on top of $462 million in regulatory penalties and

disgorgement imposed by the CFTC and the U.K.'s FSA.  As part of a deferred

prosecution agreement with the government, the DOJ charged RB S with criminal

price- fixing in violation of the Sherman Act for its participation in a conspiracy

---

[39] Press Release, U.S. Commodity Futures Trading Commission, *CFTC Order UBS to Pay $700 Million Penalty to Settle Charges of Manipulation, Attempted Manipulation and False Reporting of LIBOR and Other Benchmark Interest Rates*(Dec. 19, 2012), http://www.cftc.gov/PressRoom/PressRelease/pr6472-12.

to rig LIBOR rates with other banks.[40]

d.   In December 2013, the European Commission fined Deutsche Bank, RBS, JPMorgan, Citigroup, Societe Generale and one other bank approximately $2.3 billion in connection with rigging various LIBOR and Euribor rates.  UBS and Barclays only avoided fines because they revealed the existence of the cartel to authorities.

e.   Deutsche Bank was also recently fined a total of over $2.5 billion in penalties by various regulators, including the DOJ, CFTC, New York Department of Financial Services ("DFS") and the U.K.'s Financial Conduct Authority ("FCA") in connection with its manipulation of U.S. Dollar LIBOR and participation in a price fixing conspiracy to rig Yen LIBOR.  Assistant Attorney General Leslie R. Caldwell described the conduct as follows:  "For years, employees at Deutsche Bank illegally manipulated interest rates around the globe- including LIBORs for U.S. Dollar, Yen, Swiss Franc and Pound  Sterling, as well as EURIBOR - in the hopes of fraudulently moving the market to generate profits for their traders at the expense of the bank's counterparties."[41]

**B.       Foreign Exchange Scandal**

138.   Many of these same Defendants, including Barclays, HSBC, UBS, Citigroup, JPMorgan and RBS (or their parents or subsidiaries), were also recently the subjects of several

---

[40] Press Release, U.S. Department of Justice, *RBS Securities Japan Limited Agrees to Plead  Guilty in Connection with Long-Running Manipulation of Libor Benchmark Interest Rates* (Feb.  6,  2013), http://www.justice.gov/opa/pr/rbs-securities-japan-limited-agrees-plead-guilty-connection-long-running-manipulation-libor.

[41] Press Release, U.S. Department of Justice, *Deutsche Bank's London Subsidiary Agrees to Plead  Connection with Long-Running Manipulation of LIBOR* (Apr.  23,  2015), http://www.justice.gov/opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running-manipulation.

investigations that have resulted in substantial fines stemming from their conspiracy to manipulate foreign exchange benchmarks and fix the bid-ask spreads on foreign exchange transactions.

139.    Traders at these banks regularly exchanged confidential information in electronic chat rooms to, including details about their customers' orders, in order to collusively set key FX benchmark rates and to set artificially wide spreads on FX transactions. These traders dubbed their chat rooms (and each other) names such as "The Cartel," "The Mafia," and "One Team, One Dream."

140.    For example, in May 2015, Citicorp, JPMorgan Chase & Co., Barclays PLC and The Royal Bank of Scotland plc pleaded guilty "to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere," and agreed to pay criminal fines totaling over $2.5 billion.[42] According to the plea agreements:

> [B]etween December 2007 and January 2013, euro-dollar traders at Citicorp, JPMorgan, Barclays and RBS- self-described members of "The Cartel"- used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates. . . .  "The Cartel" traders coordinated their trading of U.S. dollars and euros to manipulate the benchmark rates set at the 1:15 p.m. and 4:00 p.m. fixes in an effort to increase their profits."[43]

*Id.*

141.    In the factual statement attached to UBS AG's plea agreement in LIBOR, UBS AG admitted that it conspired with other firms acting as dealers in the foreign exchange spot market by "agreeing to restrain competition in the purchase and sale of the EUR/USD currency

---

[42] Press Release, U.S. Department of Justice, *Five Major Banks Agree to Parent-Level Guilty Pleas* (May 20, 2015), http://www.justice.gov/opa/pr/five-major-banks-agree-parent-level-guilty-pleas.
[43] *Id.*

pair in the United States and elsewhere ... by, among other things: (i) coordinating the trading of the EUR/USD currency pair in connection with ECB and WMR benchmark currency "fixes" ..., and (ii) refraining from certain trading behavior, by withholding bids and offers, when one conspirator held an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position." [44]

142.    Regulators around the globe levied roughly $9 billion in fines and penalties to Defendants Barclays, Citigroup, JPMorgan, RBS and UBS (or their affiliates and/or parents) alone for their conduct in the foreign exchange spot market.

**C.    ISDAFix Scandal**

143.    Many of the Defendants have been subject to a CFTC investigation involving attempts to manipulate the U.S. Dollar ISDAFix, a key benchmark interest rate for a number of important financial instruments, including interest rate swaps. a global benchmark for interest rate products.

144.    The ISDAFIX was supposed to be based on Defendants' transactions in the swaps market. However, the banks colluded with one another to manipulate the ISDAFIX by sharing competitively sensitive information, including order flows, coordinating many transactions immediately before the computation window (i.e., "banging the close"), and colluding to quote the same spread during the computation window.

145.    In May 2015, the CFTC fined defendant Barclays (and its parent companies, Barclays PLC and Barclays Bank PLC) $115 million for manipulating ISDAFix.  The CFTC found that certain Barclays traders bid, offered, and executed transactions at the critical 11:00 a.m. fixing time to affect the reference rates and the published ISDAFix.

---

[44] Plea Agreement, *United States of America v. UBS AG* (D. Conn. May 20, 2015) at Ex. 1 ¶15, http://www.justice.gov/file/4405821/download.

146.    *The Wall Street Journal* reported in June 2015 that the CFTC was nearing settlements with several other banks involved in setting the ISDAFix benchmark, a panel of banks that also includes the parents or affiliates of Defendants BNP Paribas, Citigroup, Deutsche Bank, Goldman, HSBC, JPMorgan, Morgan Stanley, Nomura, RBS and UBS.

147.    The CTFC discovery that Barclays traders manipulated Treasury Securities as part of their manipulative scheme to move reference rates and spreads that influence ISDAFIX.

## V.    EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

148.    During the Class Period, Defendants actively, fraudulently and effectively concealed their collusion from Baltimore and members of the Class.  As a result of Defendants' concealment, all applicable statutes of limitations affecting plaintiff's and the Class's claims have been tolled.

149.    By its very nature, the illegal conduct alleged herein was secretive and self-concealing.  Defendants' conspiracy relied on non-public methods of communication to conceal their collusive behavior.  Plaintiff could not, and did not, discovery that it had suffered injury prior to Bloomberg's July 23, 2015 article.  For example, while UBS reportedly "barred its traders early last year from seeing client orders in the hours before an auction," UBS never publicly acknowledged this change in course, nor was that information available prior to this summer.

150.    Due to Defendants' efforts to conceal their collusive conduct, plaintiff could not, through the exercise of reasonable diligence, have learned of facts indicating that Defendants were colluding to manipulate Treasury Securities and Treasury Instruments prior to this summer. To Plaintiff's knowledge, the first news report of possible manipulation in the Treasuries Market was published on June 8, 2015, when news sources first reported that the DOJ was investigating the Treasury Securities market.

151.    As a result of the self-concealing nature of the conspiracy, the active steps taken by Defendants to fraudulently conceal their conspiracy, and the lack of public information concerning material aspects of the conspiracy, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## VI.    RESTRAINT OF TRADE AND ANTITRUST INJURY

152.    Defendants' scheme to fix Treasury auctions at artificial levels, as well as to increase the spread between Treasury auctions and Treasuries sold on the secondary market, directly and immediately impacted the market for Treasury Securities and Treasury Instruments, which are markets in which Defendants participate.

153.    Throughout the Class Period, Defendants have been horizontal competitors in the Treasuries Market. Defendants horizontally compete with each other in the Treasuries Market as primary dealers (bidding on behalf of clients and on behalf of themselves), as market makers in Treasury Securities and Treasury Derivatives, and as traders for their own accounts in Treasury Derivatives.

154.    Absent collusion and manipulation, Defendants' auction bids and trading positions, and corresponding profits or losses, would be determined through competition with other primary dealer Defendants, and competition among Defendants would contribute to the efficiency of Treasury auctions and the Treasury Market.   Defendants' collusion and manipulation, however, stifled competition and created artificial and manipulated markets.

155.    During the Class Period, Defendants manipulated the Treasury Market, including the when-issued market and Treasury Securities auctions, to reap supra-competitive profits. Defendants' conduct injured competition and the interplay of supply and demand for Treasury Securities. Defendants' collusive manipulation of the Treasuries Market had an immediate, direct, substantially certain, and foreseeable impact on the prices of Treasury Securities at

auction and in the secondary market, and Treasury Derivatives.

156.    The Mayor and City Council of Baltimore ("Baltimore" or "Plaintiff") transacted in treasury securities directly with the Defendants, including by buying treasury securities directly from Defendants on or between the days when the security was auctioned and first issued a few days later.   Defendants manipulated, and colluded to manipulate, the spread between auction and secondary market prices.   By paying inflated and supracompetitive prices for the treasury securities that it bought directly from Defendants, Baltimore was harmed. Baltimore bought hundreds of millions of dollars of treasury securities during the Class Period between auction and issue days, and was harmed by paying supra-competitive prices for these.

157.    Part of the purpose and effect of Defendants' conspiracy was to increase the spread between auction prices and secondary market prices, in a manner that cannot be explained absent collusion.   This benefited Defendants and harmed their counterparts.   For example, Baltimore bought a 26 week T-bill of $25 million par value directly from Defendant Citigroup. Baltimore purchased this treasury from Defendant on or before the security issued on July 31, 2008.  The auction yield for this treasury was 1.92%, but Citigroup sold the same treasury to Baltimore for a yield of 1.82%.  By conspiring to manipulate the spread between the auction and secondary market prices, Citigroup profited 10 basis points on this deal (or 5.4% relative to the auction yield) at Baltimore's expense.

## VII.    CLASS ACTION ALLEGATIONS

158.    Plaintiff brings this action on behalf of itself and all others similarly situated as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who, from January 1, 2007 to June 8, 2015 (the "Class Period"), purchased Treasury Securities directly from a Defendant or who transacted in a Treasury Derivative on an exchange, where such

persons (a) were domiciled in the United States, (b) purchased one or more Treasury Derivative in the United States, and/or (c) transacted in one or more Treasury Derivatives on a United States exchange.

Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the U.S. Government.

159.   Membership in the Class can be readily ascertained through records of the Defendants and records of potential class members.

160.   There are thousands of Class members, making the Class so numerous and geographically dispersed that joinder of all Class members is impracticable.

161.   There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for Treasury Securities and Treasury Instruments in violation of the Sherman Act;

b.     The identity of the participants in the conspiracy;

c.     The scope of the conspiracy;

d.     The victims of the conspiracy;

e.     The duration of the conspiracy;

f.     The nature and character of the acts performed by Defendants and their co- conspirators in furtherance of the conspiracy;

g.     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused cognizable legal injury to the business or property of plaintiff and the Class members;

h.     Whether Defendants and their co-conspirators fraudulently concealed the

conspiracy's existence from plaintiff and the Class members;

      i.     Whether Defendants' manipulation constituted a manipulative or unlawful act barred by the Commodity Exchange Act;

      j.     Whether Defendants' conduct violated the Commodity Exchange Act;

      k.     Whether Defendants were unjustly enriched at the expense of plaintiff and the Class;

      l.     Whether Defendants breached their duty of good faith and fair dealing with the Class;

      m.     The appropriate injunctive and equitable relief for the Class; and

      n.     The appropriate measure of damages sustained by plaintiff and the Class members.

162.    Baltimore's claims are typical of the claims of the other Class Members. Plaintiff and the Class Members sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct. Baltimore will fairly and adequately protect the interests of the Class and has no interests adverse to the interests of absent Class members. Additionally, Baltimore has retained counsel competent and experienced in the prosecution of class action litigation, including antitrust and commodities class action litigation.

163.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications.

164.    The questions of law and fact common to the Class members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

165.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.   The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation.   Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate the claims alleged, including those for antitrust and Commodity Exchange Act violations.   This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

### Conspiracy to Restrain Trade in Violation
### of §1 of the Sherman Act, 15 U.S.C. §1 et seq.

166.    Plaintiff incorporates by reference the preceding paragraphs and allegations. Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §1 *et seq.*

167.    During the Class Period, Defendants agreed to reduce competition amongst themselves by fixing and/or manipulating Treasury auction prices and, as a result, the price of Treasury Securities and Treasury Investments.

168.    During the Class Period, Defendants were competitors in the market for Treasury Securities and Treasury Instruments, including Treasury futures and options on Treasury futures traded on the CBOT.   Defendants nonetheless shared with each other competitively sensitive information, including client auction bidding order flow and their intended desires for the

direction of price movements in Treasury auctions and the markets for Treasury Securities and Treasury Instruments, and worked collectively to move prices in the direction they desired, to the detriment of plaintiff and members of the Class.

169.   Likewise, Defendants' collusive, manipulative, anticompetitive, and unlawful sharing of competitively sensitive data, such as client auction bidding order flow, demand for Treasury Securities and Defendants' respective desires for the direction of price movements in auctions of Treasury Securities and the markets for Treasury Securities and Treasury Instruments, allowed Defendants to trade ahead of plaintiff and members of the Class who purchased and sold U.S. Treasury Securities in the secondary market and/or Treasury Instruments.

170.   Additionally, Class members who purchased or sold Treasury Instruments were also harmed by Defendants' collusive conduct, as the prices of those instruments were tied to the prices of Treasury Securities, which, due to Defendants' coordinated, manipulative, anticompetitive, and unlawful conduct, did not reflect actual market rates.

171.   This conspiracy caused injury to both plaintiff and the Class by depriving them of the benefit of accurate Treasury Securities prices reflecting actual market conditions, as well as accurate Treasury security prices for some period before, during, and following Defendants' unlawful conduct, and thus received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct. Those who held swaps or other instruments whose cash flows were directly tied to the auction results, were similarly impacted by the manipulation in and around the auctions.

172.   The conspiracy is a *per se* violation of § 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Treasury market.  There is no

legitimate business justification for, or pro-competitive benefits from, Defendant' conspiracy and conduct.

173.   As a direct, material and proximate result of Defendants' violation of §1 of the Sherman Act, plaintiff and the Class have been injured in their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

174.   Plaintiff and members of the Class are entitled to treble damages for the violations of the Sherman Act under §4 of the Clayton Act.  Plaintiff and the Class are also entitled to an injunction against Defendants, preventing and restraining the violations alleged above, under §16 of the Clayton Act.

## COUNT II

### Manipulation in Violation of the
### Commodity Exchange Act, 7 U.S.C. §1 e*t seq.*

175.   Plaintiff incorporates by reference the preceding paragraphs and allegations.

176.   By their manipulative acts detailed herein, Defendants specifically intended to, and did in fact, manipulate prices of exchange-traded Treasury Instruments, including Treasury futures and options traded on the CBOT, in violation of Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act, 7 U.S.C. §§ 9(3) and 13(a)(2), and 17 C.P.R. §§180.1 and 180.2 promulgated thereunder.

177.   Defendants had the ability to manipulate the prices of Treasury Instruments given their privileged position as primary dealers of Treasury Securities and as a result of their significant market power and roles as market makers.  Consequently, Defendants had the ability to influence prices of Treasury Instruments, including Treasury futures and options traded on the CBOT.

178.   Defendants' and their co-conspirators' manipulation deprived Plaintiff and the

Class of a lawfully operating market during the Class Period.

179.    Defendants intended that their unlawful conduct would result in the prices of exchange-traded Treasury Instruments being artificial during the Class Period.

180.    As a result of Defendants' unlawful conduct, Defendants caused the prices of exchange-traded Treasury Instruments to be artificial during the Class Period.

181.    Plaintiff and members of the Class who transacted in Treasury Instruments during the Class Period did so at artificial prices resulting from Defendants' manipulation in violation of the Commodity Exchange Act.

182.    Defendants are liable for damages under §22 of the Commodity Exchange Act, 7 U.S.C. §25.

## COUNT III

### Principal-Agent Liability in Violation of the
### Commodity Exchange Act, 7 U.S.C. §1 *et seq.*

183.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

184.    Each of the Defendants is liable under §2(a)( 1)(B) of the Commodity Exchange Act, 7 U.S.C. §2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

185.    Plaintiff and Class members are each entitled to actual damages sustained for the violations of the Commodity Exchange Act alleged herein.

## COUNT IV

### Aiding and Abetting in Violation of the
### Commodity Exchange Act, 7 U.S.C. §1 *et seq*

186.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

187.    Defendants and their co-conspirators knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of

70

each other's, and their co-conspirators', manipulation of the Treasury security auctions, and willfully intended to assist these manipulations, which resulted in Treasury Investments, including Treasury futures and options, pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

188.   As a result of Defendants' liability for their aiding and abetting of the violations described herein, and for the unlawful conduct of their co-conspirators, Defendants are liable for damages pursuant to §22 of the Commodity Exchange Act, 7 U.S.C. §25.

## COUNT V

### Breach of the Implied Covenant of Good Faith and Fair Dealing

189.   Plaintiff incorporates by reference the preceding paragraphs and allegations.

190.   Defendants and members of the Class entered into bilateral contracts for the purchase and/or sale of Treasury Securities in the secondary markets (including when-issued Treasuries), and of Treasury Instruments such as Treasury futures and options traded on the CBOT.  Implied in these agreements were covenants that the counterparties would deal with each other in good faith and would not engage in any conduct to deprive the other of the benefits of their respective agreements.  Also implied was a promise by the Defendants, as primary dealers in Treasury Securities and market makers for both Treasury Securities and Treasury Instruments, that the price of the Treasury Securities and Treasury Instruments would not be manipulated to the Defendants' benefit and Class members' detriment.

191.   Defendants failed to perform their obligations in good faith under these agreements by knowingly, intentionally, and secretly conspiring to manipulate Treasury Securities to either reduce the payments they would have to make or to increase the payments they were entitled to receive at the expense of plaintiff and Class members.  At the very least, Defendants acted with reckless disregard for the interests of plaintiff and Class members.

71

192.    As Defendants knew, their manipulation of the prices of Treasury Securities and Treasury Instruments deprived plaintiff and Class members of the benefit of their bargain.  Had the Defendants not engaged in such manipulation, plaintiff's and Class members' transactions in Treasury Securities and Treasury Instruments would have been more profitable or losses on those transactions would have been lower. As a direct and proximate result of Defendants' knowing, intentional, and bad faith violation of their agreements' implied covenants of good faith and fair dealing, plaintiff and members of the Class have suffered damages in an amount to be determined at trial.  Plaintiff and members of the Class seek all losses caused by Defendants' manipulation, including loss of interest, lost profits and all losses on their Treasury Securities, Treasury Instruments and other financial instruments that they transacted in with Defendants.

## COUNT VI

### Unjust Enrichment

193.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

194.    Defendants benefited financially from their extensive unlawful acts described herein, including but not limited to working in concert with each other to manipulate the prices of Treasury Securities and Treasury Instruments, including Treasury futures and options.  These unlawful acts caused plaintiff and other members of the Class to suffer injury, lose money and transact in Treasury Securities and Treasury Instruments at artificial prices.

195.    Defendants were unjustly enriched as the expense of and to the detriment of Plaintiff and members of the Class. As described above, the Defendants knowingly acted in an unfair, unconscionable, and oppressive manner toward Plaintiff and members of the Class by manipulating Treasury Security and Treasury Investment yields and prices, in conscious and/or reckless disregard for the Class members' rights.

196.    Defendants were unjustly enriched at the expense of the Plaintiff and members of

the Class when the Defendants: paid Class members less for Treasury Securities and/or Treasury Investments at or around the time of Treasury auctions than they would have otherwise received absent Defendants' collusion; received payments from Class members for Treasury options that then expired out of the money due to Defendants' collusion; and/or, due to Defendants' collusion, received more from Class member floating rate payers on Treasury Security-linked interest rate swaps to which Defendants were the counterparties.

197.    The counterparty banks worked in concert and entered into a civil conspiracy and corrupt agreement to manipulate Treasury Security and Treasury Investment yields. Whereas a particular Defendant may not have profited off one transaction when viewed in isolation, the conspiracy allowed all Defendants to profit. Accordingly, any Defendant not in privity on a given transaction is included in this Claim as co-conspirator.

198.    As a direct result of the foregoing, it would be inequitable and unjust for Defendants to be permitted to enrich themselves in this manner.

199.    Each of the Defendants, in equity and good conscience, should be required to pay restitution of its own unjust enrichment to plaintiff and members of the Class.

200.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

## COUNT VII

### Fraud

201.    Plaintiff incorporates by reference the preceding paragraphs and allegations.

202.    Defendants' bids at auction included the representation that their bids were competitive and not the result of collusion.  Class members relied on this representation by buying Treasury Securities and other Treasury Instruments that were supposed to be priced in the

primary market through competitive bids. Similarly, when Defendants traded when-issued securities in advance of the auctions, they did not mention that the auction prices were rigged and manipulated, and that the when-issued prices were higher than they should be as a result of Defendants' rigging the market.

203.    Defendants knew that their representations were false and material, and that their omissions were material. The misrepresentations and omissions caused Plaintiff losses because Plaintiff would not have bought the instruments had they known the trust and because the collusion depressed the value of Plaintiff's instruments.

## PRAYER FOR RELIEF

204.    Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that plaintiff be designated as class representatives, and that plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate §1of the Sherman Act;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint and that the Court direct such other equitable relief as may be appropriate;

D.    That the Court award plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

E.    That the Court find that Defendants violated the Commodity Exchange

Act and award appropriate damages;

F.     That the Court award plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

G.     That the Court directs such further relief it may deem just and proper.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: New York, New York
           November 6, 2015

SUSMAN GODFREY L.L.P.

/s/ Arun Subramanian
William Christopher Carmody
Arun Subramanian
Seth Ard
560 Lexington Avenue, 15th Floor
New York, New York  10022
Phone:  (212) 336-8330
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com